

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of A.J., DOB: 10/30/06, | ) ) ) | DIVISION ONE |
| | ) | No. 72255-7-I |
| A Minor Child, | ) ) | |
| LEONA LEE, | ) ) | |
| Appellant, | ) ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES | ) ) ) ) ) | |
| Respondent. | ) ) | FILED: August 10, 2015 |

DWYER, J. — After a 14-day fact-finding hearing, the trial court found that the Department of Social and Health Services did not meet its burden of proof with regard to its allegation that Leona Lee's daughter A.J. was a dependent child as defined by statute and alleged in the Department's petition. Notwithstanding this determination, and contrary to law, the trial court did not enter an order dismissing the dependency petition. Instead, the court entered an order declaring its "intent" to dismiss the petition while requiring the parties to develop a plan to transition A.J. back to Lee's care and custody.

Over the next half year, the trial court held repeated hearings to evaluate Lee's progress in complying with the transition plan. When Lee experienced

some difficulty meeting the terms of the plan, the Department filed a motion to establish A.J.'s dependency under RCW 13.34.030(6)(c) and, for the first time, RCW 13.34.030(6)(a).[1] Without convening a trial, hearing testimony, or allowing Lee to examine witnesses, the trial court (after allowing each side to present five minutes of legal argument) entered an order declaring A.J. dependent under both provisions.

Lee now appeals, contending that the trial court violated both due process and statutory requirements by (1) entering a delayed dependency determination without holding a further fact-finding hearing, and (2) by entering a finding based on abandonment, which was never pleaded in the dependency petition. We agree. Moreover, we conclude that the trial court erred in the first instance by failing to dismiss the dependency petition as to A.J. upon its determination, following the 14-day fact-finding hearing, that A.J. had not been proved to be a dependent child. Accordingly, we reverse.

I

Leona Lee is the mother of eight children: M.W. (born August 10, 1996), Q.S. (born October 27, 1998), D.S. (born February 22, 2002), K.W. (born December 22, 2003), At.J. (born August 11, 2005),[2] A.J. (born October 30,

---

[1] RCW 13.34.030(6) provides, in pertinent part:
　　(6) "Dependent child" means any child who:
　　(a) Has been abandoned;
　　. . .
　　(c) Has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.
[2] The Department refers to this child as T.J.

2006), Ah.T. (born March 23, 2011),[3] and Al.T. (born July 9, 2012).[4] A.J. is the subject of this appeal.

Before moving to Washington, Lee and her children lived in Texas, where the family first came to the attention of child protection services. In December 2004, police in Texas responded to a 911 call at Lee's apartment and found her four children unattended. The children reported Lee had gone to the store, and Lee returned while police were speaking with the children. As a result of this incident, M.W., Q.S., D.S., K.W., and At.J., once he was born, were placed in foster care and then with Lee's maternal grandmother for a year. Eventually, the legal petition filed in Texas was dismissed and the children were returned to Lee's care.

In January 2010, Lee left her children in the care of her friend, Christopher Dixon.[5] While she was away, Dixon hit Q.S. in the face, knocking out one tooth and breaking another. Lee called the police when she returned. Lee did not take Q.S. to the doctor until four or five days later. She later acknowledged that this was a poor decision.

Then-four-year-old A.J. was present during Dixon's assault of Q.S. Moreover, this was not the first domestic violence incident that A.J. had witnessed. In 2009, A.J. had also witnessed Lee's then-boyfriend, Charles Beasley, hit Lee during an argument.

---

[3] The Department refers to this child as A.T.
[4] The Department also refers to this child as A.T.
[5] The same person is also referred to as Curtis Dixon.

In April 2010, Lee began a romantic relationship with Alex Taylor.[6] Their relationship was volatile, and Taylor was arrested twice in Texas for domestic violence. During a domestic violence incident in 2010, Taylor hit Lee with his fist, causing her head and lip to bleed. Lee was five months pregnant with Ah.T. at the time.

Lee, her children, and Taylor moved to Washington in February 2012 because Lee's mother was sick. They first lived with some of Lee's family members for several weeks. They then moved to an Extended Stay America motel in north Seattle, where Lee lived until April 2013. Wellspring Family Services paid for Lee and her family to live at the motel.

On September 8, 2012, Lee went to her mother's funeral and left her children in Taylor's care at the motel. Lee gave Taylor permission to discipline her children. Taylor used an electrical cord to whip Q.S. When K.W. ran to get help for Q.S., Taylor assaulted K.W. as well. Taylor was arrested and pleaded guilty to assaulting Q.S. and K.W. The court entered a no-contact order prohibiting Taylor from coming within 500 feet of Q.S. and K.W., their residence, and their school.

On October 15, 2012, a police officer found Taylor in the motel where the children lived. K.W. was present at the time. As a result, Taylor was arrested for violating the no-contact order.

In September 2012, Heather Lofgren, a CPS investigator/social worker, investigated a report of physical abuse and neglect in Lee's home. Lofgren

---

[6] Taylor is the alleged father of the two youngest children, Al.T. and Ah.T.

- 4 -

attempted to work with Lee on a voluntary basis before filing a dependency petition, but Lee told Lofgren that she would prefer to go to court.

Thereafter, on November 1, 2012, Lofgren filed a petition alleging Lee's eight children were dependent under RCW 13.34.030(6)(c) because they had no parent capable of adequately caring for them. The same day, the court granted the Department's motion to place the children in shelter care. A.J. has remained in foster care ever since.

Lofgren later explained that she filed the petition because of Taylor's presence at the motel after his release from jail. Lofgren believed Lee "was not able to protect her children from unsafe caregivers or abide by court orders." However, Lofgren noted that Lee's children appeared happy and healthy, they were well-behaved and polite, and she had no concerns about their physical condition. Lofgren also explained that she had no concerns about Lee directly harming her children. Her only concern was with Lee's ability to protect the children from Taylor.

Lee participated in a court-ordered mental health intake assessment with Gloria Hicks, a mental health clinician, on February 4, 2013. Hicks believed Lee exercised impaired judgment in letting Taylor watch her children and in not knowing the full extent of the no-contact order. Hicks thought Lee would benefit from housing resources, vocational services, and grief counseling. However, Hicks concluded that Lee demonstrated no diagnosable mental illnesses or personality disorders, and had no substance abuse issues. Hicks reported that

Lee "has no more than everyday problems and her main concern is to get her children back together."

Beginning in May 2013, however, Lee struggled to attend visitation. With no children in the household, Wellspring stopped funding Lee's housing at the Extended Stay motel. As a result, Lee moved to Tacoma. From there, Lee struggled to find housing, sometimes living in shelters, in her car, or with family members. Lee was also diagnosed with arthritis in her knee, which made walking very difficult, significantly decreasing her mobility. Lee visited her children only once between May 3 and October 2013.

In September and October 2013, the trial court held a lengthy fact-finding hearing to adjudicate the Department's dependency petition. After hearing from 23 witnesses and reviewing 48 exhibits over the course of a 14-day trial, the trial court entered extensive oral findings on November 21, 2013. The trial court identified Lee's parental deficiencies as being a failure to protect her children from violent partners, poor insight into choices she makes with partners, willful abandonment of her children without insight into the emotional harm that it causes, chronic homelessness, and poor oversight in terms of her children's educational needs.

The trial court reviewed the evidence for each child, and decided that all of the children, except for A.J. and her sister Ah.T., were dependent. The trial court intended to dismiss the petition as to A.J. and Ah.T. because it had not heard evidence that Taylor had tried to discipline the girls, it believed the girls posed less of a threat to Taylor's authority, and it had not heard evidence of how the

"trauma had impacted them." The guardian ad litem (GAL), Joan Freeman, then asked the court to consider an in-home dependency for the girls instead of dismissal. The trial court stated, "I need to think this through," and asked the parties to return after the midday recess.

After the midday recess, the Department pointed out that Lee and Taylor would be co-parenting together, and the girls would be exposed to the trauma of witnessing domestic violence in the family home. The GAL also pointed out that the standard for dependency was risk of substantial harm, not actual harm. The trial court asked whether dismissing the petition against Ah.T. would mean the court would lose authority to limit Taylor's access to her. Lee's counsel agreed that Taylor would have free access to Ah.T. if the petition was dismissed. The trial court reconsidered his decision as to Ah.T. and found her dependent, expressing the intention of returning her home "very soon."

As to A.J., the trial court found that A.J. had "only seen her Mom once since August 13th" and that "she need[ed] counseling." The trial court found that A.J. had witnessed Taylor assault her brother Q.S. The trial court found that A.J. had witnessed Beasley assault her mother in Texas. The trial court also was concerned about the mother's lack of stable housing.

However, the trial court noted that A.J. was "happy, healthy, well-developed and polite." The trial court further explained, "I can distinguish her from the other children with respect to Ms. Lee being able to protect her from Mr. Taylor. I don't believe that she's in the same position as the older children." The trial court also emphasized that the Department had offered no evidence that A.J.

suffered any trauma or emotional impact from witnessing the assaults: "I just didn't see the particularized evidence as I did with the other children."

Accordingly, the trial court found that the Department failed to meet its burden of proving A.J. dependent by a preponderance of the evidence.

> I don't think the Department's carried the day with respect to the petition for [A.J.], and I don't believe that there's – that they have shown by a preponderance of the evidence that she is in danger as the other children are, and I'm going to dismiss the petition in respect to [A.J.].

The trial court explained that it would delay signing the dismissal order for "two weeks or so" to establish a plan to transition A.J. back into Lee's care. Specifically, the trial court said, "I think that delay is warranted so that [A.J.] has some ability for transition and some predictability of what that transition is going to look like." Lee and her counsel agreed to this transition plan.

That same day, the trial court signed a written order announcing its intent to dismiss the dependency petition as to A.J.[7] The court also "anticipate[d] that [Ah.T.] [would] be placed with Ms. Lee upon entry of its dispositional order." As a condition of A.J.'s and Ah.T.'s return, the court ordered Lee to refrain from any in-person contact with Taylor, limiting her to telephone and e-mail contact only.

On December 12, 2013, at a disposition hearing, the trial court and the parties discussed Lee's housing situation and A.J.'s transition plan. Lee reported that she had been admitted to a secure shelter in Snohomish County, where she had her own room and access to an adjoining room for her children. However, she could stay there for only 30 days. The Department acknowledged that Lee

---

[7] The order began, "It is the Court's intention to dismiss the dependency petition concerning [A.J.]."

had applied to several different housing agencies, but both transitional and Section 8 housing were completely full. The trial court allowed Lee to have several overnight visits with A.J. in December, including consecutive visits from December 27 through 29. It instructed Lee not to leave the shelter while A.J. was in her care. However, the trial court refused to dismiss the dependency petition until the parties established a plan for A.J. to remain in counseling and finish the year at her current school.[8]

At a further disposition hearing on December 19, the parties discussed the Department's recommended services for Lee regarding her dependent children. Lee agreed to parent coaching. She also agreed to participate in domestic violence counseling. Lee further agreed to grief counseling, but refused to undergo the neuropsychological evaluation recommended by the Department because there was no evidence that she suffered from a mental illness or personality disorder. Nevertheless, the trial court ultimately ordered the evaluation. When Lee's counsel asked "for the Court to order a date for dismissal as to [A.J.]," the court replied, "we're going to revisit that issue on the third [of January]." Later, the court summarized, "I want to see how the visits go, I'd like an update on the housing on [January 3], but . . . I think you should expect that I'll sign the dismissal on the 3rd with respect to [A.J.]."

---

[8] The court explained its decision thusly:
*And I think it's everyone's expectation that I'm going to be dismissing the petition with respect to [A.J.] today. I am not dismissing the petition with respect to [A.J.], and the reason I am not – it's still my intention to do so –* but I was clear that before I did that, there needed to be a transition plan in place. And I understand that both sides are sort of shooting at each other across the tracks here, because the one side blames the other for it not happening, but it hasn't happened yet.
(Emphasis added.)

- 9 -

At the January 3, 2014 hearing, Lee reported that she could stay at the Snohomish County shelter until January 10. Lee was in contact with several organizations regarding rental assistance, including Wellspring and Catholic Community Services. Lee noted that it was difficult to plan for A.J.'s schooling because she did not have concrete housing plans. The trial court announced that it would not sign the dismissal order until she had a clear plan in mind.[9] The trial court also acknowledged, "I don't think merely being homeless is a sufficient basis for me to not sign the dismissal petition."[10] Otherwise, the Department reported that Lee's overnight visits with A.J. "have gone really well," including the three-night visit. A.J. "[was] happy and seem[ed] to have enjoyed her time." Lee had also complied with the court's order to remain at the shelter during the overnights.

On January 21, 2014, the trial court signed a formal order of dependency and disposition as to A.J.'s seven siblings. It did not enter any order regarding A.J.

On January 31, 2014, Lee moved to dismiss the dependency petition as to A.J. In an attached declaration, Lee explained the steps she had taken to comply with the court's order to establish a plan regarding A.J.'s schooling and

---

[9] It was in the context of this conversation that the trial court first acknowledged that A.J. was in legal limbo. The trial court stated, "I really want to know [what is going to happen to A.J. for her schooling] before I'm going to dismiss that petition. It is not fair to her to have her in *limbo* and you not know what the plan is." (Emphasis added.)

[10] The statement was in response to a clarifying question by the Department's attorney:
MR. MASCO: Is the Court contemplating that [A.J.]'s case be dismissed if the mother has not obtained housing?
THE COURT: I am. I've said that [A.J.]'s going back with her mom, and, you know, I think it is in her interest, of course, that Ms. Lee have housing; but I don't think merely being homeless is a sufficient basis for me to not sign the dismissal petition.

- 10 -

transportation to school. Lee and her attorney also called A.J.'s counselor several times, but the counselor refused to speak with Lee until she had a release authorizing her to do so. The GAL acknowledged that Lee "made significant progress over the last few weeks in her efforts to obtain housing." The trial court did not dismiss the petition.

At the next scheduled hearing, on February 14, the trial court noted that Lee had missed some combined family visits and some parent coaching sessions. The trial court also expressed concern that Lee was still having in-person contact with Taylor. However, the trial court praised Lee for working hard to cooperate with the Department to obtain housing. The trial court also commended Lee's overall increased visitation and her improved relationships with her children. Again, the trial court refused to dismiss A.J.'s dependency petition.[11]

In a March 14 written report to the court, the Department noted that Lee "has participated greatly through self advocacy and the advocacy through her attorney on the development of what services would be beneficial to her." The Department also acknowledged Lee's progress in seeking housing, as well as

---

[11] The court explained its decision as follows:
[L]et me start with the request to dismiss for [A.J.]. I had said earlier, and I meant what I said, that there were some things I really wanted in place before I did that. One was a plan for counseling; the second was the plan for school; and the third was the plan for stable housing for Ms. Lee.
 . . . .
And it sounds like Ms. Lee is on the cusp of additional funding from Wellspring so that she can be at the Extended Stay, and that would put into place a number of positive things. I think the school issue would be much clearer there. Ms. Freeman and Ms. Lee have worked on the transportation issue, which would be in place in making sure [A.J.] got to school. And the counseling issue, I'm not finding fault from Ms. Lee because she's made efforts there; and it's, again, it's an issue I think of that just the stars not being quite properly aligned.

her consistency attending Saturday visits. Furthermore, the Department stated, "Ms. Lee has made progress with maintaining her appointments with the social workers. Ms. Lee is cooperative and engaging during these appointments."

At a March 28 hearing, the trial court learned that Lee was continuing to miss visits with her children. She also was continuing to have contact with Taylor. However, the trial court again acknowledged that Lee was improving and making progress with the parenting coaching. Again, the trial court refused to dismiss the dependency petition as to A.J. because Lee did not have stable housing.[12]

On June 10, 2014, the Department filed a "Motion to Establish Dependency" as to A.J. The Department renewed its original allegation that A.J. was dependent under RCW 13.34.030(6)(c) because she had no parent capable of adequately caring for her. For the first time, the Department also requested that the trial court find A.J. dependent as an abandoned child under RCW 13.34.030(6)(a). The Department noted that A.J.'s case was in "legal limbo" and that A.J. had been in shelter care for over 18 months.[13] The Department claimed

---

[12] In so ruling, the trial court stated:
> Mr. Daugherty [(Lee's attorney)], in his usual fashion, makes a very compelling request for you to have [A.J.], have you dismiss the petition with respect [A.J.] right now. You're almost there having a house, but you don't have it yet and I'm not going to dismiss it at this point. I am going to have you come back. I'm keeping you coming back on a short period and I know I probably drive you crazy doing that . . . .

Notably, despite having acknowledged at an earlier date that homelessness alone would not have been a sufficient basis for not signing a dismissal order, the trial court's decision at this hearing appears to have turned solely on Lee's housing situation. The trial court confirmed this impression in a later exchange with the Department's attorney. In response to a comment by the Department's attorney expressing disbelief that Lee's housing plans at the time would materialize, the trial court stated, "That's why I haven't dismissed the petition with respect to [A.J.]."

[13] The Department's motion stated, in pertinent part:
> While the court's Order of November 21, 2013 may have been well meaning, the fact of the matter is that [A.J.] remains in the legal limbo of shelter

that the trial court had the authority to declare A.J. dependent without holding a new evidentiary hearing.

In support of its motion, the Department included a short declaration from social worker Sadie Bingham explaining Lee's difficulty finding suitable housing. The Department also attached a report from the GAL. The GAL wrote:

> Ms. Lee's inability to obtain stable housing for herself and her daughter and to provide a plan to meet [A.J.]'s other needs is a substantial change in circumstances which supports modification of the November 21, 2013 Order and a finding that [A.J.] has no parent capable of adequately caring for her at this time.

The GAL focused on Lee's difficulties since the dependency trial. She noted Lee's failure to secure stable housing. She pointed to Lee's difficulty following through with A.J.'s counselor and her failure to appear for the neuropsychological evaluation. The GAL also noted that the parenting coach had discontinued parent coaching with Lee. Lastly, the parenting coach also filed a brief report stating that Lee continued to have contact with Taylor.

Lee opposed the Department's motion, pointing out that RCW 13.34.110 specifies that dependency may be established only through a fact-finding hearing.

On June 24, 2014, more than seven months after the conclusion of the 14-day dependency fact-finding hearing, the trial court convened a brief hearing to consider the Department's motion. The trial court did not hear live testimony, or allow Lee to testify or call witnesses. Instead, the trial court allowed each attorney five minutes for legal argument. Lee's attorney contested many of the

care, with no deadlines in sight for her mother to comply with any of the court's directives. Additionally, no permanency planning can be contemplated because [A.J.] has yet to be declared a dependent child as to her mother, Leona Lee.

Department's factual allegations, pointing out that Lee actively participated in visits and met regularly with the people from the Department working on her case. He also asserted that declarations were inadmissible for dependency determinations. Moreover, Lee's attorney insisted that it was "ludicrous" to establish dependency by a motion.

The trial court granted the Department's motion and found A.J. dependent under both RCW 13.34.030(6)(a) and RCW 13.34.030(6)(c). The court discussed its ruling, in pertinent part, as follows:

> What happened at the conclusion of that trial is you could look at one or two ways.
> The first way is that she's been essential[ly] in limbo, legal limbo, short of a definitive order with respect to dependency or dismissal. No order has been signed to either of those. So that's one way to view this is essentially a continuance for the benefit of her mother to take certain steps to satisfy what I articulated in my oral ruling back last year. And those things included eliminating contact with Mr. Taylor, obtaining housing, attending visits, making sure that [A.J.] had a counseling plan and the like.
> The second posture with -- through which or lens through which to view what happened last November is that the oral ruling I made was, in fact, dismissal of the petition for dependency. And as such, if that was the case then presumably [A.J.] would be back with her mom but she wasn't, because before I was going to allow that I needed to see that there was a transition plan. So I will give you my ruling looking through both lenses. Through the lens of her being in legal limbo and me -- or the Court not issuing a definitive order.
> I disagree with counsel that -- they've said nothing changed. Well, actually things have changed since the time of the trial, the dependency trial. And those changes include continued contact with Mr. Taylor, no housing, failure to attend visits, and no concrete counseling plan. And the additional time afforded Ms. Lee, while there has been marginal progress, it has not been progress that I had predicted would occur. And my prediction was in error.
> To the extent that this, in fact, was a final ruling on dependency.
> There is relief afforded here and frankly, Mr. Daugherty [(Lee's attorney)], has cited the proper procedural rule which is CR

> 60, and I think -- this Court in terms of relief of judgment CR 60(b)(11) as well as CR 60(c) both would afford appropriate relief in these circumstances. The fact of the matter is [A.J.] hasn't -- the ball has not been moved forward for [A.J.] and I would say just the opposite has happened because of the delay of time and these other shortcomings: the continued contact with Mr. Taylor, no housing, failure to attend visits, no counseling plan, the failed coaching aspects lead me to conclude that not only has [A.J.] been effectively abandoned, but Ms. Lee is not in a position to provide appropriate parenting. So I'm granting the motion. I'm going to find her dependent.

The trial court entered a written dependency order on July 10. It identified Lee's parental deficiencies as follows: failure to protect her children from violent partners, chronic homelessness, poor oversight in ensuring her children were enrolled in and attending school, and minimal attendance to their health needs. The trial court also found that Lee "willfully abandoned" A.J. by failing to attend visits during the summer of 2013 and that the "effect of this abandonment on [A.J.] is profound." The trial court concluded that Lee's failure to comply with the transition plan constituted a "change in circumstances" that warranted the finding of dependency.

> Ms. Lee has continued to have contact with Mr. Taylor despite court order, has not obtained safe and stable housing for [A.J.] and herself despite significant housing assistance from the Department, has continued to be inconsistent in her visits with her children, and has not followed through with a counseling plan for [A.J.], and has been discharged from parenting counseling with Esther Patrick.

The trial court then concluded, "The Department has shown that currently the child has been effectively abandoned by Ms. Lee, and has no parent capable of adequately caring for her and, consequently, that she is in circumstances which constitute danger of substantial damage to her psychological or physical development."

- 15 -

Lee appeals.

## II

We first address whether the trial court erred by not dismissing the dependency petition upon determining at the conclusion of the 14-day fact-finding hearing that the Department had failed to meet its burden of proof with regard to its allegation that A.J. was a dependent child. Having determined that A.J. was not proved to be dependent, the trial court did so err.

Parents have a fundamental liberty interest in the care and welfare of their minor children. In re Welfare of Sumey, 94 Wn.2d 757, 762, 621 P.2d 108 (1980) (citing Stanley v. Illinois, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). However, the State has an interest in protecting the physical, mental, and emotional health of children. In re Welfare of Becker, 87 Wn.2d 470, 476-77, 553 P.2d 1339 (1976). It is well established that when a child's physical or mental health is seriously jeopardized by parental deficiencies, "the State has a parens patriae right and responsibility to intervene to protect the child." Sumey, 94 Wn.2d at 762 (citing Parham v. J.R., 442 U.S. 584, 603, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979)). The legislature recognized these competing interests in RCW 13.34.020, in which it declared that "the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized."

Because "'[a] parent's right to control and to have the custody of his children is a fundamental civil right,'" "[p]rocedures used to terminate the relationship between parent and child must meet the requisites of the due

process clause of the Fourteenth Amendment to the United States Constitution." In re Dependency of K.N.J., 171 Wn.2d 568, 574, 257 P.3d 522 (2011) (quoting Halsted v. Sallee, 31 Wn. App. 193, 195, 639 P.2d 877 (1982)); accord Lassiter v. Dep't of Soc. Servs. of Durham County, N.C., 452 U.S. 18, 24-33, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981). In Washington, the legislature has provided a procedure by which a child may be declared "dependent," thereby transferring legal custody to the State, which takes account of the rights of both the parent and the child. In re Dependency of Schermer, 161 Wn.2d 927, 942, 169 P.3d 452 (2007). This procedure is designed to comply with the requirements of due process. Halsted, 31 Wn. App. at 195 ("The applicable statutory provisions for termination of a parent and child relationship under RCW 13.34 set out an elaborate scheme for providing all parties with notice and an opportunity to be heard.").

The procedure is generally as follows: "Any person" may file a petition with the juvenile court showing that there is a dependent child and requesting that the court deal with the child as provided by the dependency statutes. RCW 13.34.040. Within 75 days after the petition is filed, the court must hold a fact-finding hearing to determine whether the allegations in the petition are true. RCW 13.34.070. Under certain circumstances, the child may be placed in shelter care (out-of-home care) while the adjudication of the dependency is pending. RCW 13.34.050, .065.

At the fact-finding hearing, the petitioner has the burden of establishing by a preponderance of the evidence that the child meets one of the statutory

definitions of dependency.[14] RCW 13.34.110(1). The rules of evidence apply at the hearing. RCW 13.34.110(1). Moreover, the parent has the right to be represented by an attorney, to introduce evidence, to be heard in his or her own behalf, to examine witnesses, to receive a decision based solely on the evidence adduced at the hearing, and to an unbiased fact finder. RCW 13.34.090(1), .110(1). After the fact-finding hearing, unless it dismisses the dependency petition, the court must "make written findings of fact, stating the reasons [for its decision]." RCW 13.34.110(1).

If the court finds that the child is dependent, it then holds a disposition hearing to determine placement of the child and the services to be provided to the family. RCW 13.34.110(4), .130. Following this hearing, the court must either "[o]rder a disposition that maintains the child in his or her home," or "[o]rder the child to be removed from his or her home and into the custody, control, and care of a relative or other suitable person, the department, or a supervising agency." RCW 13.34.130(1).

The court may proceed to the disposition stage only if the child is found dependent at the fact-finding stage. See RCW 13.34.130 ("If, after a fact-finding hearing . . . it has been proven by a preponderance of the evidence that the child is dependent . . . the court shall enter an order of disposition pursuant to this section."). This limitation on the court's authority to interfere in the parent-child relationship is fundamental. "[Our Supreme C]ourt has long recognized that a court may not concern itself with a child's welfare *without first determining the*

---

[14] By definition, a "[d]ependent child" is one who has been abandoned, abused or neglected, or has no parent, guardian, or custodian capable of providing the child adequate care. RCW 13.34.030(6).

*child is dependent.*" K.N.J., 171 Wn.2d at 577 (emphasis added); accord In re Frank, 41 Wn.2d 294, 295, 248 P.2d 553 (1952) ("Of course, the court below can concern itself with the welfare of this child only after finding it to be a *dependent* child as defined by the statute.").[15,16]

The trial court herein transgressed this limitation on its authority. Even though it concluded that the Department had not met its burden of proving A.J. to be a dependent child, the court nevertheless continued to "concern itself with [A.J.'s] welfare," thereby improperly interfering with Lee and A.J.'s parent-child relationship.

At the end of the fact-finding hearing, the trial court orally ruled that the Department had not proved A.J. to be a dependent child. Furthermore, that

---

[15] Both parties cite In re Dependency of T.R., 108 Wn. App. 149, 29 P.3d 1275 (2001), and In re Welfare of Shantay C.J., 121 Wn. App. 926, 91 P.3d 909 (2004), in which the trial court made a preliminary determination following a fact-finding hearing but declined to enter a final order until a later date. The Department asserts that these cases support the procedure engaged in herein. They do not. Those cases involved a fact-finding pertaining to the termination of parental rights, not a finding of dependency. The children in those cases had already been declared to be dependent. Thus, the courts in those cases retained authority over the children at issue therein even in the event that the Department failed to prove that the parents' rights should be terminated.

The Department also cites In re Pawling, 101 Wn.2d 392, 679 P.2d 916 (1984). In that case, the trial court provided an oral opinion after the fact-finding hearing expressing its belief that the petitioner had met its burden regarding each of the findings required for a termination of parental rights, except the child's best interest—an issue that had not been raised in the pleadings. The trial court granted the petitioner leave to amend the complaint to raise the issue of best interest and continued the matter for additional testimony on that issue. Several months later, the trial court held an additional fact-finding hearing to address the issue of best interest. Following that hearing, the court concluded that termination was in the child's best interest. Pawling is distinguishable from the case at hand because it involved a continuance of the fact-finding hearing for a proper purpose—to provide the parent whose rights were at risk of being terminated with adequate notice of the amended pleadings and an opportunity to prepare to respond.

[16] At oral argument, the Department hypothesized that the trial court might still have been acting pursuant to its shelter care authority at the time that it ordered the transition plan. However, the Department later conceded that, if the trial court had decided that A.J. had not been proved to be dependent after the fact-finding hearing, the shelter care order would not have survived that decision. The Department's concession is well-taken. Shelter care is intended to be a temporary placement for a child "while the adjudication of the dependency is pending." RCW 13.34.065(4)(b). The shelter care order does not survive an unsuccessful effort to establish dependency at the fact-finding adjudication.

same day, the trial court entered an order expressing its "intention to dismiss the dependency petition concerning" A.J. Consistent with its expressed intention, the trial court did not enter findings of fact regarding A.J. Moreover, when the trial court signed a formal order of dependency and disposition as to A.J.'s seven siblings it did not do the same for A.J. It is clear that the trial court determined that the Department did not prove its case. This was a decision on the merits of the evidence.

Despite ruling that A.J. had not been proved to be a dependent child, the trial court did not dismiss the dependency petition. Instead, it ordered the parties to develop a plan to transition A.J. back into her mother's care and, for the seven months that followed, the trial court continued to dictate the parent-child relationship between Lee and A.J. in the guise of monitoring compliance with the "transition plan."

In the trial court's own words, during the seven months following the fact-finding hearing, A.J. was in "legal limbo." The trial court exceeded its statutory and constitutional authority when it placed her in that state. The trial court was obliged to dismiss the dependency petition. It erred by not so doing. Accordingly, its subsequent orders must be reversed and the case remanded for the entry of an order of dismissal.

III

Our discussion of the previous issue fully resolves this dispute. Nevertheless, given the unusual procedural history of this case, we deem it necessary to address two additional claims of error raised by Lee.

First, Lee asserts that the trial court erred by entering an order granting the Department's motion to deem A.J. to be a dependent child, rather than requiring that such an allegation be determined only after a fact-finding hearing. Lee is correct.

The motion-hearing procedure engaged in herein is in no way contemplated by the statutory scheme. The Department asserts that this is fine—asserting that the motion it brought was simply a continuation of the evidentiary hearing conducted seven months previously. We disagree with the Department's characterization of events—it is clear that a trial was previously held and concluded and that, in the words of the trial judge, the Department had "failed to carry the day." However, even if the Department was correct (and, we repeat, it is not) in its contention that this was a continuation of the seven-months-before-conducted bench trial, the procedures employed in resolving its motion were contrary to law.

As described above, the statutory scheme governing dependencies requires that the court hold a fact-finding hearing on the dependency petition. At that hearing, the rules of evidence apply and the parent is guaranteed certain rights, including the right to introduce evidence, to be heard in his or her own behalf, to examine witnesses, and *to receive a decision based solely on the evidence presented at the hearing.* RCW 13.34.090(1), .110(1). In sum, dependency can be ordered only after the statutory requirements are proved at a fact-finding hearing in which the parent has a meaningful opportunity to participate.

In this case, after holding a fact-finding hearing that complied with the statutory requirements, the trial court determined that the Department had failed to meet its burden of proving A.J. to be dependent. The trial court did not dismiss the dependency petition but, instead, declared its intent to dismiss the petition and required the parties to develop a plan to transition A.J. back to Lee's care and custody. In the months that followed, the trial court convened several hearings to review the case. In advance of these hearings, the trial court received written reports from the Department. At the hearings, the trial court heard argument from the parties regarding Lee's progress relative to the transition plan and whether the dependency petition should be dismissed. The trial court repeatedly refused to dismiss the petition.

More than six months after the conclusion of the fact-finding hearing, the Department filed a "Motion to Establish Dependency" as to A.J. In support thereof, the Department submitted a declaration from a social worker, the GAL, and the parenting coach. The trial court addressed the Department's motion at the next scheduled hearing. After permitting each party five minutes of legal argument, the trial court ruled that the Department had proved A.J. to be dependent. The trial court then entered an order of dependency. Some of the facts found to support the order were based on information presented to the trial court after the conclusion of the fact-finding hearing.[17]

---

[17] For example, finding of fact "z." states, in pertinent part:
Ms. Lee has continued to have contact with Mr. Taylor despite court order, has not obtained safe and stable housing for [A.J.] and herself despite significant housing assistance from the Department, has continued to be inconsistent in her visits with her children, and has not followed through with a counseling plan for [A.J.], and has been discharged from parenting counseling with Esther Patrick.

- 22 -

The procedure engaged in herein denied Lee many of the rights guaranteed to her by applicable statutes. Indeed, the information presented to the trial court in the months following the fact-finding hearing, including the declaration and reports submitted in support of the Department's motion, was not subject to the rules of evidence. Moreover, at the motion hearing, Lee was not given an opportunity to present evidence, testify in her own behalf, or examine witnesses. Furthermore, because some of the facts found to support the order of dependency were based on information presented to the trial court after the conclusion of the fact-finding hearing, Lee was also denied the right to receive a decision based solely on the evidence presented at that hearing.[18]

The trial court erred by entering the dependency order as the result of a motion hearing, in violation of Lee's right to have all evidence properly vetted through the statutory fact-finding adjudication process.

IV

The remaining claim of error that we must address is Lee's assertion that the trial court erred by finding A.J. dependent based, in part, on the Department's allegation that she was abandoned, which was not pleaded in the petition and was raised for the first time in its "Motion to Establish Dependency." Lee is again correct.

The person who files a dependency petition must allege that the child therein at issue meets one of the statutory definitions of a dependent child. RCW

---

[18] In addition to the panoply of statutory violations, the procedure engaged in herein violated Lee's right to due process. See Shantay, 121 Wn. App. 926 (holding that the trial court violated the parent's right to due process by failing to reconvene the fact-finding hearing before entering an order terminating the parent's rights where the trial court had concluded after the initial fact-finding hearing that the Department had not met its burden of proof for termination).

13.34.040(1). After a petition is filed, the court must convene a fact-finding hearing. That hearing is held "on the petition"—that is, based on the allegations made in the petition. RCW 13.34.110(1). Moreover, the parent is guaranteed essential rights at the fact-finding hearing, including the right to introduce evidence, testify in one's own behalf, and examine witnesses. RCW 13.34.090(1), .110(1).

In its dependency petition, the Department alleged that A.J. had no parent capable of adequately caring for her and, thus, was dependent pursuant to RCW 13.34.030(6)(c). The 14-day fact-finding hearing proceeded based on that allegation alone.[19] More than six months later, in its "Motion to Establish Dependency," the Department alleged for the first time that A.J. had been abandoned and, thus, should also be found to be dependent pursuant to RCW 13.34.030(6)(a). At the hearing on the Department's motion, the trial court gave Lee's counsel just five minutes of legal argument to rebut the allegations against her, including the new allegation of abandonment. After hearing from both parties, the trial court determined A.J. to be dependent under both RCW 13.34.030(6)(a) and RCW 13.34.030(6)(c).

Once again, the procedure used by the trial court herein denied Lee important statutory rights. The abandonment allegation was not pleaded in the dependency petition. Nor was the petition amended to include this allegation before or during the fact-finding hearing. Thus, Lee had no notice of the abandonment allegation at the fact-finding stage. The petition also was not

---

[19] Indeed, at the fact-finding hearing, when the Department appeared to argue neglect under RCW 13.34.030(6)(b), the trial court emphasized that "[t]his is not a neglect petition."

amended to include the abandonment allegation after the allegation was first made in the Department's motion. But even if the petition had been so amended, a second fact-finding hearing was never convened. Accordingly, the abandonment allegation was never subject to Lee's statutorily guaranteed right to introduce evidence, testify in her own behalf, or examine witnesses. Thus, Lee was deprived of her right to contest the Department's new allegation at a full adversarial proceeding.[20]

The trial court erred by entering the dependency order based on the unpleaded and untested abandonment allegation.

V

Reversed and remanded for the entry of an order of dismissal.

We concur:

---

[20] Here, too, the trial court's statutory violations also denied Lee the right to due process. "Notice, open testimony, time to prepare and respond to charges, and a meaningful hearing before a competent tribunal in an orderly proceeding are all elements of civil due process," which binds the court in proceedings to curtail parental rights. In re Moseley, 34 Wn. App. 179, 184, 660 P.2d 315 (1983). The procedure used by the trial court herein deprived Lee of each of these elements of due process.